1

**LEILA W. MORGAN**
California Bar No. 232874

2

**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900

3

San Diego, California 92101-5008
Telephone: (619) 234-8467

4

Leila_Morgan@fd.org

5

6

Attorneys for Mr. Prado-Franquez

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11

**(HONORABLE LARRY A. BURNS)**

12

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 07CR3212-LAB |
| | ) | |
| Plaintiff, | ) | DATE: January 7, 2008 |
| | ) | TIME: 9:00 a.m. |
| v. | ) | |
| | ) | |
| LUIS ARMANDO PRADO-FRANQUEZ, | ) | STATEMENT OF FACTS AND |
| | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. | ) | |

13

14

15

16

17

18

**I.**

19

**STATEMENT OF FACTS[1]**

20

21

On October 29, 2007, Senior Patrol Agent Robert Rivers was assigned to patrol near Jamul,

22

California. The area Agent Rivers was patrolling was approximately five miles north of the international

23

boundary between the United States and Mexico and twelve miles east of the Otay Mesa, California Port

24

of Entry. At approximately 4:00 a.m. Agent Rivers responded to a seismic sensor intrusion device in an area

25

known as Barrett Junction, California. After arriving in the area he followed foot sign on a trial that is

26

known to be used by illegal aliens furthering their entry into the United States. Approximately twenty-five

27

28

1. The following is based primarily upon information supplied through Government discovery. Mr. Prado-Franquez does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

minutes later he observed a group of eleven individuals walking on the trail.  He caught up with the group

and identified himself as a border patrol agent.  Three individuals were not apprehended with the group.

Agent Rivers questioned the other eight individuals, including Mr. Prado-Franquez, who all responded they

were citizens of Mexico who were illegally present in the United States.  Mr. Prado-Franquez also stated

that he was born in Mexico and he had entered the United States one day before.  Mr. Prado-Franquez and

the other seven individuals in the group were arrested and taken to the Brown Field Station for processing.

At the Brown Field station Mr. Prado-Franquez was fingerprinted and records checked were

performed, revealing a criminal and immigration history.  Following the records checks, at approximately

9:30 a.m Agent Alex Markle informed Mr. Prado-Franquez of his Miranda rights, at which time Mr. Prado-

Franquez is alleged to have agreed to waive those rights.  During questioning Mr. Prado-Franquez made

incriminating statements about this offense.

On  November 28, 2007, an Indictment was handed down charging  Mr. Prado-Franquez with

violating 8 U.S.C. §1326 (a) and (b), deported alien found in the United States who had been removed

subsequent to September 12, 1994.

These motions follow.

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Prado-Franquez moves for the production of the following discovery.  This request is not limited

to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See

United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

To date, ***defense counsel has received only 32 pages of discovery***. Mr. Prado-Franquez respectfully

requests that the Government be ordered to produce discovery because Mr. Prado-Franquez has reason to

believe that he has not received all the discoverable material in his case.  Mr. Prado-Franquez **specifically**

**requests production of a copy of the taped proceedings and any and all documents memorializing the**

**deportation proceeding allegedly held  and any other proceedings that the Government intends to rely**

**upon at trial**.  This request includes discovery of materials known to the Government attorney, as well as

discovery of materials which the Government attorney may become aware of through the exercise of due

1   diligence.  See FED. R. CRIM. P. 16.

2       Mr. Prado-Franquez has also not received a full copy of hisr A-file.  Mr. Prado-Franquez specifically

3   requests the documents memorializing the alleged deportation proceedings and any other proceedings that

4   the Government intends to rely upon at trial.

5       Mr. Prado-Franquez additionally requests that the Court order the Government to allow him the

6   opportunity to review his A-file in its entirety.  First, the A-file contains documentation concerning his

7   alleged deportation.  Part of Mr. Prado-Franquez defense may be that her underlying deportation was invalid.

8   The documents in the A-file would help illuminate the validity or futility of such a defense.  For example,

9   A-file documents typically contain biographical information.  Such information is essential to determining

10  whether Mr. Prado-Franquez's deportation was invalid.

11      Second, the Government will likely try to show at trial that a Government officer searched the A-file

12  and did not find an application by Mr. Prado-Franquez for permission to enter the United States.  Mr. Prado-

13  Franquez anticipates that the Government will attempt to admit a "Certificate of Non-Existence of Record"

14  against her,  arguing that if Mr. Prado-Franquez had ever applied for permission to enter the United States,

15  such an application would be found in the A-file and because such an application is not in the A-file, Mr.

16  Prado-Franquez must not have applied for permission to enter the United States.

17      Although the certificate might be admissible, the question of the thoroughness of the search

18  conducted by the Government of the A-file  is, and should be, open to cross-examination.  United States v.

19  Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation.").   Mr. Prado-

20  Franquez should be able to review his A-file in order to see whether any application for lawful admission

21  exists.  Moreover, Mr. Prado-Franquez should also be able to verify whether other documents that would

22  ordinarily be in the A-file are "non-existent," or otherwise missing from his A-file.  Mr. Prado-Franquez may

23  assert a defense that his application for lawful entry was lost or otherwise misplaced by the Government.

24  He must be allowed the opportunity to review his A-file and the manner in which it is being maintained by

25  the Government in order to present this defense.

26      In addition, Mr. Prado-Franquez moves for the production of the following discovery:

27      1. **Mr. Prado-Franquez's Statements.**  The Government must disclose to Mr. Prado-Franquez all

28  copies of any written or recorded statements made by Mr. Prado-Franquez; the substance of any statements

made by Mr. Prado-Franquez which the Government intends to offer in evidence at trial; any response by Mr. Prado-Franquez to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of Mr. Prado-Franquez's oral statements contained in the handwritten notes of the Government agent; any response to any <u>Miranda</u> warnings which may have been given to Mr. Prado-Franquez; as well as any other statements attributed to Mr. Prado-Franquez. FED. R. CRIM. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> Mr. Prado-Franquez's statements, whether written or oral, regardless of whether the Government intends to make any use of those statements. **Mr. Prado-Franquez specifically requests all audio and videotaped copies of his statements and any rough notes taken pertaining to the substance of his statements. Mr. Prado-Franquez requests that the government provide him with a court-certified transcript of the compact disc depicting Mr. Prado-Franquez's post-arrest interrogation by the agents.**

2. **<u>Arrest Reports, Notes and Dispatch Tapes.</u>** Mr. Prado-Franquez also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of Mr. Prado-Franquez or any other discoverable material is contained. Such material is discoverable under FED. R. CRIM. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to Mr. Prado-Franquez. <u>See</u> FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and 12(i).

3. **<u>Brady Material</u>**. Mr. Prado-Franquez requests all documents, statements, agents' reports, and tangible evidence favorable to Mr. Prado-Franquez on the issue of guilt and/or which affects the credibility of the Government's witnesses and the Government's case. Under <u>Brady</u>, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

4. **<u>Any Information That May Result in a Lower Sentence Under The Guidelines.</u>** Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this

1  information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating

2  evidence relevant to a possible future determination with respect to sentencing.

3       5.  **Mr. Prado-Franquez's Prior Record.**  Mr. Prado-Franquez requests disclosure of his prior

4  record.  FED. R. CRIM. P. 16(a)(1)(B).

5       6.  <u>**Any Proposed 404(b) Evidence.**</u>  Evidence of prior similar acts is discoverable under Fed. R.

6  Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

7  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

8  general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

9  trial.  Sufficient notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which

10  a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d

11  822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4

12  F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

13       This request includes any "TECS" records as well as any other record(s) of prior border crossings

14  (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as

15  impeachment, or in its rebuttal case.  Although there is nothing intrinsically improper about prior border

16  crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject

17  to 404(b), as they are "other acts" evidence that the government must produce before trial.  <u>United States</u>

18  <u>v. Vega</u>, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

19       The defendant requests that such notice be given three weeks before trial to give the defense time

20  to adequately investigate and prepare for trial.

21       7.  **Evidence Seized.**  Mr. Prado-Franquez requests production of evidence seized as a result of any

22  search, either warrantless or with a warrant.  FED. R. CRIM. P. 16(a)(1)(c).

23       8.  **Request for Preservation of Evidence.**  Mr. Prado-Franquez specifically requests the

24  preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

25  custody, or care of the Government and which relates to the arrest or the events leading to the arrest in this

26  case.  This request includes, but is not limited to, the results of any fingerprint analysis, Mr. Prado-

27  Franquez's personal effects, and any evidence seized from Mr. Prado-Franquez.

28       9.  **Henthorn Material.**  Mr. Prado-Franquez requests that the Assistant United States Attorney

1   ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

2   involved in the present case for impeachment material. See Kyles v. Whitley, 514 U.S. 419 (1995) (holding

3   that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

4   the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

5   1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

6   conduct examination of records; appropriate Government agency may review files and notify AUSA of

7   contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

8   Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

9       10. **Tangible Objects.** Mr. Prado-Franquez requests the opportunity to inspect, copy, and test, as

10  necessary, all other documents and tangible objects, including photographs, books, papers, documents,

11  fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

12  Government's case-in-chief, or were obtained from or belong to Mr. Prado-Franquez. FED. R. CRIM. P.

13  16(a)(1)(c). **Specifically, Mr. Prado-Franquez requests copies of the audio tapes of his alleged prior**

14  **deportations or removals.**

15      11. **Expert Witnesses.** Mr. Prado-Franquez requests the name, qualifications, and a written

16  summary of the testimony of any person that the Government intends to call as an expert witness during its

17  case in chief. FED. R. CRIM. P. 16(a)(1)(E). The defense requests the notice of expert testimony be provided

18  at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to

19  this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

20  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any

21  expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and

22  must determine, reliability and relevancy of expert testimony and such determinations may require "special

23  briefing or other proceedings").

24      12. **Evidence of Bias or Motive to Lie.** Mr. Prado-Franquez requests any evidence that any

25  prospective Government witness is biased or prejudiced against Mr. Prado-Franquez, or has a motive to

26  falsify or distort his or her testimony.

27      13. **Impeachment Evidence.** Mr. Prado-Franquez requests any evidence that any prospective

28  Government witness has engaged in any criminal act whether or not resulting in a conviction and whether

1  any witness has made a statement favorable to Mr. Prado-Franquez.  See Fed. R. Evid. 608, 609 and 613;

2  Brady v. Maryland.

3          14.  **Evidence of Criminal Investigation of Any Government Witness.**  Mr. Prado-Franquez

4  requests any evidence that any prospective witness is under investigation by federal, state or local authorities

5  for any criminal conduct.

6          15.  **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.**

7  Mr. Prado-Franquez requests any evidence, including any medical or psychiatric report or evaluation, that

8  tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is

9  impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever

10  been an alcoholic.

11          16.  **Witness Addresses.**  Mr. Prado-Franquez requests the name and last known address of each

12  prospective Government witness.  Mr. Prado-Franquez also requests the name and last known address of

13  every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who

14  will not be called as a Government witness.

15          17.  **Name of Witnesses Favorable to Mr. Prado-Franquez.**  Mr. Prado-Franquez requests the

16  name of any witness who made an arguably favorable statement concerning Mr. Prado-Franquez or who

17  could not identify her or who was unsure of her identity, or participation in the crime charged.

18          18.  **Statements Relevant to the Defense.**  Mr. Prado-Franquez requests disclosure of any statement

19  relevant to any possible defense or contention that he might assert in his defense.

20          19.  **Jencks Act Material.**  Mr. Prado-Franquez requests production in advance of trial of all

21  material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18

22  U.S.C. § 3500.  Advance production will avoid the possibility of delay at trial to allow Mr. Prado-Franquez

23  to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate

24  account of the witness' interview is sufficient for the report or notes to qualify as a statement under section

25  3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963).  In United States v. Boshell, 952 F.2d

26  1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject

27  of the interview the notes are then subject to the Jencks Act.

28

20. **Giglio Information & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Prado-Franquez requests all statements and/or promises, express or implied, made to any witness, in exchange for their testimony in this case, and all other information which could be used for impeachment.

21. **Agreements Between the Government and Witnesses.** Mr. Prado-Franquez requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement, promise, or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective Government witness and the Government (federal, state and/or local). This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any discussion with a potential witness regarding that witness' immigration status and/or any affect that the witness' statements or lack thereof might have on that status, including the granting or revoking of such immigration status or any other immigration status, including but not limited to citizenship, nationality, a green card, border crossing card, parole letter, or permission to remain in the United States.

22. **Informants and Cooperating Witnesses.** Mr. Prado-Franquez requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Prado-Franquez. The Government must disclose the informant's identity and location, as well as the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The Government must disclose any information derived from informants which exculpates or tends to exculpate Mr. Prado-Franquez. Brady v. Maryland, 373 U.S. 83 (1963)

23. **Bias by Informants or Cooperating Witnesses.** Mr. Prado-Franquez requests disclosure of any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States, 405 U.S. 150 (1972). Such information includes, but is not limited to, any inducements, favors, payments or threats that were made to the witness in order to secure cooperation with the authorities.

07cr3212-LAB

24. **Scientific and Other Information.**  Mr. Prado-Franquez requests the results of any scientific or other tests or examinations conducted by any Government agency or their subcontractors in connection with this case.  See Rule 16(a)(1)(D).

25. **Residual Request.**  Mr. Prado-Franquez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  Mr. Prado-Franquez requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

### III.

### THIS COURT SHOULD DISMISS THE INDICTMENT FOR ITS FAILURE TO ALLEGE ESSENTIAL ELEMENTS OF THE OFFENSE

The indictment charges Mr. Prado-Franquez with being a previously-deported alien found in the United States in violation of 8 U.S.C. § 1326.  The indictment fails to allege elements necessary to convict Mr. Prado-Franquez of the offense: that Mr. Prado-Franquez knew he was in the United States, he failed to undergo inspection and admission by an immigration officer at the nearest inspection point, and that he voluntarily entered the United States.  As a consequence, it must be dismissed. See e.g., Nyrienda v. I.N.S., 279 F.3d 620 (8th Cir. 2002) (setting forth the components of an entry under the immigration law); see also United States v. Pernillo-Fuentes, 252 F.3d 1030 (9th Cir. 2001);  United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999);.

However, because these issues were decided against Mr. Prado-Franquez in United States v. Rivera-Sillas,  376 F.3d 887 (9th Cir. 2004), they are not briefed herein, but are raised to preserve them for further appeal.  (Mr. Prado-Franquez would be happy to submit further briefing on these issues to this Court, if so ordered.)

# IV.

## THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. PRADO-FRANQUEZ

**A.    The Court Must Suppress Mr. Prado-Franquez's Alleged Pre-Miranda Statements Because They Were Elicited as the Result of Custodial Interrogation.**

The material produced thus far by the government indicates that Agents first confronted and interrogated Mr. Prado-Franquez, regarding his immigration status, shortly after 4:00 a.m. in an isolated area near the Barrett Junction area. This entire interrogation preceded any form of administration of <u>Miranda</u> rights by the agents by approximately 5 hours.

"The ruling in <u>Miranda</u> prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." <u>United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. <u>Id.</u> Although questions that include routine biographical information usually do not trigger the safeguard of <u>Miranda v. Arizona</u>, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." <u>Id.</u>

In <u>United States v. Kim</u>, 292 F.3d 971, 973 (9th Cir. 2002),[2] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." <u>Id.</u> (citations omitted); <u>see also</u> <u>United States v. Estrada-Lucas</u>, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth

---

[2] In <u>Kim</u>, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere." 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. <u>Id.</u>

1  Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal

2  activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave.  United

3  States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[3]

4      It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the

5  Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed

6  nor told that he was under arrest, was nonetheless in custody for Miranda purposes.  Beraun-Panez held that

7  "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

8  812 F.2d at 580.[4]

9      Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met. Regarding

10 the language used by Agent Rivers to summon Mr. Prado-Franquez, while the report does not state the exact

11 words used in identifying himself as a border patrol agent and to get Mr. Prado-Franquez into custody,

12 whatever words used clearly indicated to Mr. Prado-Franquez that Agent Rivers was a law enforcement

13 officer and that Mr. Prado-Franquez was in custody. The facts that Agent Rivers was in uniform carrying

14 his gun, and in an isolated area with no means to escape substantiate this factor.

15     Concerning the extent to which Mr. Prado-Franquez was confronted with guilt, he was apprehended

16 in an isolated area in the very early morning hours and immediately interrogated about his immigration

17 status.  It is, however, unclear how long the detention took place or the amount of pressure applied to Mr.

18 Prado-Franquez since the agent's report does not address how long the interrogation and detention took and

19 only uses boiler-plate language to describe Mr. Prado-Franquezs responses. Further, the defendant in Kim

20 was isolated from  family, a fact that the Court gave great weight to.  Kim, 292 F.3d at 977.

21     Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Prado-

22 Franquez was isolated, the agent's questioning bore on Mr. Prado-Franquez's alienage, which is an element

23 of the charged offense, 8 U.S.C. § 1326.  See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir.

24 1991).  This question in such a setting carried with it implicit suspicion of criminal activity. A person, such

25 as Mr. Prado-Franquez, subjected to such questioning in such a situation obviously does not reasonably feel

26

27     [3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

28     [4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him
separated from his co-worker in a remote rural area.  Beraun-Panez, 812 F.2d at 580.

free to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border, any questioning regarding an individual's alienage falls under the rubric of custodial interrogation. Furthermore, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr. Gonzalez-Sandoval where he was born and whether he possessed documents to verify the legality of his presence in the United States. Id. The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned Mr. Gonzalez-Sandoval about any alias he possessed. Id. The agents ran an INS record check against Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record. Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted statements by Mr. Gonzalez-Sandoval about his name and alias. Id. at 1047.

In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to obtaining the biographical data. Id. Afterwards, the agent made further inquiries at his office and within three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his interrogation could lead to federal charges against the defendant. Id. at 1278-1279.

07cr3212-LAB

1   Here, it is obvious that the information the agent elicited from Mr. Prado-Franquez, during the

2   interrogation, regarding his citizenship, application for permission to enter, and use of a document was

3   "reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in

4   fact two of the four elements that they government must prove to obtain a conviction for a violation of 8

5   U.S.C. § 1326. Moreover, it is undisputed that Mr. Prado-Franquez was not read her <u>Miranda</u> rights at that

6   point, nor advised that her answers to the agent's questions could result in federal charges against her.

7   Therefore, statements must be suppressed.

8   **B.    Mr. Prado-Franquez's Alleged Post-Miranda Statements Must Be Suppressed Because They**
        **Were Not Voluntary.**

9

10   Since Mr. Prado-Franquez's initial statements were the product of unwarned custodial interrogation,

11   the Court must suppress any and all fruits of those statements. These fruits include the subsequent warned

12   confession as well as all of the derivative evidence discovered by the government as a result of the

13   knowledge it obtained through the illegal interrogation of Mr. Prado-Franquez.

14   When asked to suppress the fruits of unwarned statements obtained during custodial interrogation,

15   the court's "critical inquiry is whether the unwarned statements . . . [were] made voluntarily." <u>United States</u>

16   <u>v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1048 (9th Cir. 1990); <u>see also</u> <u>United States v. Wauneka</u>, 842 F.2d

17   1083 (9th Cir. 1988) and 18 U.S.C. § 3501(b). The government must show voluntariness by a

18   preponderance of the evidence. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986). The court must determine

19   voluntariness by a close scrutiny of the totality of the circumstances under which the subject of the custodial

20   interrogation made the statements. <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985); <u>Schneckloth v.</u>

21   <u>Bustamonte</u>, 412 U.S. 218, 226 (1973).

22   Although one factor that must exist in order to find the subject's statement was not made voluntarily

23   is coercive police conduct, <u>Connelly</u>, 479 U.S. at 167, "[f]ailure to administer *Miranda* warnings [prior to

24   the time the defendant makes statements] creates a presumption of compulsion." <u>Oregon v. Elstad</u>, 470 U.S.

25   298, 307 (1985). In addition, such coercion, or "overreaching," must be "causally related to the [statement]."

26   <u>Connelly</u>, 479 U.S. at 163-64. Put another way, the statement must be a product, or a result, of the police

27   conduct. <u>Id.</u> (discussing cases).

28   In a case where the government obtains statements from an individual before the admonishment

required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), as well as statements after allegedly warning the individual as <u>Miranda</u> requires, the admissibility of the statements obtained after the <u>Miranda</u> warnings depends on whether the government compelled the statements obtained prior to the administration of the <u>Miranda</u> warnings.  <u>United States v. Wauneka</u>, 842 F.2d 1083, 1086-87 (9th Cir. 1988).

Thus, Mr. Prado-Franquez moves to suppress all statements, and the fruits thereof, obtained in violation of <u>Miranda</u>.  Moreover, Mr. Prado-Franquez challenges any alleged <u>Miranda</u> waiver, as any waiver was not knowing, intelligent, or voluntary. Under prevailing Ninth Circuit law, the government bears the burden of demonstrating a <u>Miranda</u> waiver by clear and convincing evidence.  <u>See</u> <u>Schell v. Witek</u>, 218 F.3d 1017 (9th Cir. 2000)(en banc)(constitutional rights may ordinarily be waived only if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent.")(citations omitted). Moreover, this Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights." <u>Id.</u> (citations omitted).

**C.    Mr. Prado-Franquez Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.**

This Court should conduct an evidentiary hearing to determine whether Mr. Prado-Franquez's statements should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Prado-Franquez were  voluntarily made. In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Prado-Franquez understood the nature of the charges against him and whether he understood his rights.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. <u>See</u> <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" <u>Id.</u> at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings.

**V.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. FERNANDEZ-SERRANO OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 7.[5]  That grand jury was instructed by this Court on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  This Court's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[6]  These instructions compounded this Court's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[7]

> **1.    This Court Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[8] this Court instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

---

[2] "CR" refers to the Clerk's Record in Case Number 07CR3212-LAB .

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Fernandez-Serrano requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[5] See also id. at 20 ("You're all about probable cause.").

federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, this Court referred to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id.  That "principle" was this Court's discussion of the grand jurors' inability to give effect to their disagreement with Congress.  See id. at 8-9.  Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between this Court and various prospective grand jurors, reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  In this passage, this Court twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

//

//

addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is this Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Prado-Franquez will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

This Court made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, this Court provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, this Court's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror

listening to this exchange could only conclude that there was *no* case in which this Court would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, this Court drove the point home in his exchange with REA. REA first advised this Court of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. This Court first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

paradigm, this Court then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers.  I'll excuse you at this time.

Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, this Court made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[9] See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

**2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, this Court also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[10]

---

[6] This point is underscored by this Court's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[7]These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  This Court advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, this Court gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, this Court unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.     Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which This Court Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

---

go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, this Court affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

This Court's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. This Court's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, this Court would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while this Court instructed the Grand Jury that it had the power to question witnesses, this Court's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[11] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

_____

[8] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

07cr3212-LAB

1
2
3

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

4   Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

5   the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

6   "controls not only the initial decision to indict, but also significant questions such as how many counts to

7   charge and whether to charge a greater or lesser offense, including the important decision whether to charge

8   a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas

9   II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

10  refuse to indict someone even when the prosecutor has established probable cause that this individual has

11  committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899

12  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

13  (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the

14  Ninth Circuit. But not in this Court's instructions.

15  **C.    This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in
16         Both *Vasquez* and *Navarro-Vargas II*.**

17         The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

18  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

19  decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

20  every finding of probable cause because the term "should" may mean "what is probable or expected." 299

21  F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge

22  Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

23  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

24  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See

25  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

26  Diction and Language Guide 1579 (1999) (brackets in original)).

27         The debate about what the word "should" means is irrelevant here; the instructions here make no

28  such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While this Court used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that this Court could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, this Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in context, it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205. Clearly this Court was not.

The full passage cited above effectively eliminates any possibility that this Court intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

//

By the same token, if this Court said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," <u>see</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205 (citing <u>Marcucci</u>, 299 F.3d at 1159), then this Court would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[12]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  <u>See generally</u> <u>United States v. Lewis</u>, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)** The first occasion occurred in the following exchange when this Court conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want you to say, "Well, yeah, there's probable cause.  But I still don't like what the government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if  you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

<u>See</u> Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and this Court expressly disapproved of any vote that might prevent that.  <u>See id.</u> ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

---

[9] This argument does not turn on Mr. Prado-Franquez's view that the <u>Navarro-Vargas</u>/<u>Marcucci</u> reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by this Court in his unique instructions, context which eliminates the <u>Navarro-Vargas</u>/<u>Marcucci</u> reading as a possibility.

(**2**)    In an even more explicit example of what "should" meant, this Court makes clear that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.  Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused. Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that this Court's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But this Court did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(**3**)    As if the preceding examples were not enough, this Court continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." See id. at 61.

(**4**)    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, this Court reiterated that "should" means "shall" when it

reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of

what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, this Court advised the grand jurors that the were forbidden from considering the penalties

to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
> about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern
> you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
> *that they cannot consider the punishment or the consequence that Congress has set for these*
> *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision
> of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

reasons.  First, this Court did not use the term "should" in the passage quoted above.  Second, that context,

as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time

again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant
> committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge
> a greater offense or a lesser offense; numerous counts or a single count; and perhaps most

significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. This Court's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Fernandez-Serrano understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

This Court did not limit itself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, this Court has both fashioned his own rules and enforced them.

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that this Court had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, this Court informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or

that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15

(emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by

the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present

exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no

exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under

the Fifth Amendment.

**VI.**

**MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

***Defense counsel has received only 35 pages of discovery***. As more information comes to light, due

to the government providing additional discovery in response to these motions or an order of this Court, the

defense may find it necessary to file further motions. It is, therefore, requested that defense counsel be

allowed the opportunity to file further motions based upon information gained through the discovery process.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII.

## CONCLUSION

For the foregoing reasons, Mr. Prado-Franquez respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: January 3, 2008

*s/ Leila W. Morgan*
**LEILA W. MORGAN**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Prado-Franquez
Leila_Morgan@fd.org