1  KAREN P. HEWITT
United States Attorney
2  WILLIAM A. HALL, JR.
Assistant U.S. Attorney
3  California State Bar No. Pending
United States Attorney's Office
4  880 Front Street, Room 6293
San Diego, California 92101-8893
5  Telephone: (619) 557-7046/(619) 235-2757 (Fax)
Email: william.a.hall@usdoj.gov
6
Attorneys for Plaintiff
7  United States of America

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10                              )    Criminal Case No. 07CR3212-LAB
UNITED STATES OF AMERICA,        )
11                              )    DATE:        January 7, 2008
                    Plaintiff,  )    TIME:           2:00 p.m.
12                              )    Before Honorable Larry A. Burns
        v.                       )
13                              )
LUIS ARMANDO PRADO-FRANQUEZ,     )    UNITED STATES' STATEMENT OF
14                              )    FACTS AND MEMORANDUM OF
                    Defendant(s).)    POINTS AND AUTHORITIES
15  _____ )

16                              **I**

17                 **STATEMENT OF THE CASE**

18         The Defendant, Luis Armando Prado-Franquez (hereinafter "Defendant"), was charged by

19  a grand jury on November 28, 2007, with violating 8 U.S.C. § 1326, deported alien found in the

20  United States.  Defendant was arraigned on the Indictment on November 29, 2007, and entered a

21  plea of not guilty.

22                              **II**

23                   **STATEMENT OF FACTS**

24         Defendant was apprehended on the morning of October 29, 2007, by a Border Patrol Agent

25  ("BPA") five miles north of the United States/Mexico International Boundary and approximately

26  twelve miles east of the Otay Mesa, California Port of Entry.  There, at approximately 4:00 a.m

27

28                              3

that day, a BPA responded to a seismic intrusion sensor activation and arrived to the area. He followed footprints on a trail that is only used by illegal aliens to further their entry into the United States. After approximately twenty-five minutes, the BPA observed eleven individuals walking on the trail in front of him. The BPA caught up to the group of eleven and identified himself; three of the eleven individuals fled and were not caught. The BPA individually questioned the remaining eight individuals, one of which was Defendant, concerning their citizenship. There, Defendant admitted that he was a citizen of Mexico with no documents entitling him to enter or remain in the United States.

Defendant was transported to the Brown Field Border Patrol Station's processing center. At the center, BPAs used Defendant's fingerprints to perform a computerized check of Defendant's criminal and immigration history. Soon thereafter, Defendant was advised of his <u>Miranda</u> rights and stated that he understood them and was willing to answer questions without the presence of an attorney. Defendant admitted to being a citizen and national of Mexico without any immigration documents allowing him to enter or remain in the United States legally. He further admitted that he has been previously removed from the United States, stated that he entered the United States by walking through the mountains, and admitted that he has never applied for permission to re-enter the United States since his removal.

**B.**     **DEFENDANT'S CRIMINAL AND IMMIGRATION HISTORY**

Preliminary criminal history reports show that Defendant has felony convictions in California. Arising out of one incident, Defendant was convicted in 1994 in Los Angeles of Attempted Murder, in violation of Cal. PC § 187 and 664; Assault With a Deadly Weapon, in violation of Cal. PC § 245(A)(1); and Robbery, in violation of Cal. PC § 211. He was sentenced to 23 years incarceration. Defendant also has a prior misdemeanor conviction.

Defendant's was administratively removed to Mexico on December 27, 2006.

//

//

4                                        07CR3212-LAB

### III

### MEMORANDUM OF POINTS AND AUTHORITIES

**A.     DISCOVERY REQUESTS AND MOTION TO PRESERVE EVIDENCE**

> **1.     The Government Has or Will Disclose Information Subject To Disclosure Under Rule 16(a)(1)(A) and (B) Of The Federal Rules Of Criminal Procedure**

The government has disclosed, or will disclose well in advance of trial, any statements subject to discovery under Fed. R. Crim. P. 16(a)(1)(A) (substance of Defendant's oral statements *in response to government interrogation*) and 16(a)(1)(B) (Defendant's relevant written or recorded statements, written records containing substance of Defendant's oral statements *in response to government interrogation*, and Defendant's grand jury testimony).

> **a.     The Government Will Comply With Rule 16(a)(1)(D)**

Defendant has already been provided with his or her own "rap" sheet and the government will produce any additional information it uncovers regarding Defendant's criminal record.  Any subsequent or prior similar acts of Defendant that the government intends to introduce under Rule 404(b) of the Federal Rules of Evidence will be provided, along with any accompanying reports, at a reasonable time in advance of trial.

> **b.     The Government Will Comply With Rule 16(a)(1)(E)**

The government will permit Defendant to inspect and copy or photograph all books, papers, documents, data, photographs, tangible objects, buildings or places, or portions thereof, that are material to the preparation of Defendant's defense or are intended for use by the government as evidence-in-chief at trial or were obtained from or belong to Defendant.

Reasonable efforts will be made to preserve relevant physical evidence which is in the custody and control of the investigating agency and the prosecution, with the following exceptions: drug evidence, with the exception of a representative sample, is routinely destroyed after 60 days, and vehicles are routinely and periodically sold at auction.  Records of radio transmissions, if they existed, are frequently kept for only a short period of time and may no longer be available.

1    Counsel should contact the Assistant United States Attorney assigned to the case two weeks before

2    the scheduled trial date and the Assistant will make arrangements with the case agent for counsel

3    to view all evidence within the government's possession.

4                        c.        The Government Will Comply With Rule 16(a)(1)(F)

5            The government will permit Defendant to inspect and copy or photograph any results or

6    reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof,

7    that are within the possession of the government, and by the exercise of due diligence may become

8    known to the attorney for the government and are material to the preparation of the defense or are

9    intended for use by the government as evidence-in-chief at the trial.  Counsel for Defendant should

10   contact the Assistant United States Attorney assigned to the case and the Assistant will make

11   arrangements with the case agent for counsel to view all evidence within the government's

12   possession.

13
                         d.        The Government Will Comply With Its Obligations Under Brady v.
14                                 Maryland

15           The government is well aware of and will fully perform its duty under Brady v. Maryland,

16   373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory

17   evidence within its possession that is material to the issue of guilt or punishment.  Defendant,

18   however, is not entitled to all evidence known or believed to exist that is, or may be, favorable to

19   the accused, or that pertains to the credibility of the government's case.  As stated in United States

20   v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

21               [T]he prosecution does not have a constitutional duty to disclose every bit of
                 information that might affect the jury's decision; it need only disclose information
22               favorable to the defense that meets the appropriate standard of materiality.

23   611 F.2d at 774-775 (citations omitted).  See also United States v. Sukumolachan, 610 F.2d 685,

24   687 (9th Cir. 1980) (the government is not required to create exculpatory material that does not

25   exist); United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976) (Brady does not create any

26   pretrial privileges not contained in the Federal Rules of Criminal Procedure).

27

28                                                6                        07CR3212-LAB

1

          e.       Discovery Regarding Government Witnesses

2

          (1)      Agreements.  The government has disclosed or will disclose the

3
terms of any agreements by Government agents, employees, or attorneys with witnesses that testify

4
at trial.  Such information will be provided at or before the time of the filing of the Government's

5
trial memorandum.[1/]  The government will comply with its obligations to disclose impeachment

6
evidence under Giglio v. United States, 405 U.S. 150 (1972).

7

          (2)      Bias or Prejudice.  The government has provided or will provide

8
information related to the bias, prejudice or other motivation to lie of government trial witnesses

9
as required in Napue v. Illinois, 360 U.S. 264 (1959).

10

          (3)      Criminal Convictions.  The government has produced or will

11
produce any criminal convictions of government witnesses plus any *material* criminal acts which

12
did not result in conviction.  The government is not aware that any prospective witness is under

13
criminal investigation.

14

          (4)      Ability to Perceive.  The government has produced or will produce

15
any evidence that the ability of a government trial witness to perceive, communicate or tell the

16
truth is impaired or that such witnesses have ever used narcotics or other controlled substances,

17
or are alcoholics.

18

          (5)      Witness List.  The government will endeavor to provide Defendant

19
with a list of all witnesses which it intends to call in its case-in-chief at the time the government's

20
trial memorandum is filed, although delivery of such a list is not required.  See United States v.

21
Dischner, 960 F.2d 870 (9th Cir. 1992); United States v. Culter, 806 F.2d 933, 936 (9th Cir. 1986);

22
United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).  Defendant, however, is not entitled to

23
the production of addresses or phone numbers of possible government witnesses.  See United

24

25
     [1]     As with all other offers by the government to produce discovery earlier than it is required

26
to do, the offer is made without prejudice.  If, as trial approaches, the government is not prepared
to make early discovery production, or if there is a strategic reason not to do so as to certain
discovery, the government reserves the right to withhold the requested material until the time it

27
is required to be produced pursuant to discovery laws and rules.

28

1    States v. Thompson, 493 F.2d 305, 309 (9th Cir. 1977), cert. denied, 419 U.S. 834 (1974).

2    Defendant has already received access to the names of potential witnesses in this case in the

3    investigative reports previously provided to him or her.

4            (6)     Witnesses Not to Be Called.  The government is not required to

5    disclose all evidence it has or to make an accounting to Defendant of the investigative work it has

6    performed.  Moore v. Illinois, 408 U.S. 786, 795 (1972); see  United States v. Gardner, 611 F.2d

7    770, 774-775 (9th Cir. 1980).  Accordingly, the government objects to any request by Defendant

8    for discovery concerning any individuals whom the government does not intend to call as

9    witnesses.

10           (7)     Favorable Statements.  The government has disclosed or will

11   disclose the names of witnesses, if any, who have made favorable statements concerning Defendant

12   which meet the requirements of Brady.

13           (8)     Review of Personnel Files.  The government has requested or will

14   request a review of the personnel files of all federal law enforcement individuals who will be called

15   as witnesses in this case for Brady material.  The government will request that counsel for the

16   appropriate federal law enforcement agency conduct such review.  United States v. Herring, 83

17   F.3d 1120 (9th Cir. 1996); see, also, United States v. Jennings, 960 F.2d 1488, 1492 (9th Cir.

18   1992); United States v. Dominguez-Villa, 954 F.2d 562 (9th Cir. 1992).

19       Pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and United States v.

20   Cadet, 727 F.2d 1452 (9th Cir. 1984), the United States agrees to "disclose information favorable

21   to the defense that meets the appropriate standard of materiality . . ."  United States v. Cadet, 727

22   F.2d at 1467, 1468.  Further, if counsel for the United States is uncertain about the materiality of

23   the information within its possession in such personnel files, the information will be submitted to

24   the Court for in camera inspection and review.

25           (9)     Government Witness Statements. Production of witness statements

26   is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only after the witness testifies

27

28                                       8                  07CR3212-LAB

1    on direct examination. United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986); United States

2    v. Mills, 641 F.2d 785, 790 (9th Cir. 1981)).  Indeed, even material believed to be exculpatory and

3    therefore subject to disclosure under the Brady doctrine, if contained in a witness statement subject

4    to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under

5    the Act.  See United States v. Bernard, 623 F.2d 551, 556-57 (9th Cir. 1979).

6          The government reserves the right to withhold the statements of any particular witnesses

7    it deems necessary until after the witness testifies.  Otherwise, the government will disclose the

8    statements of witnesses at the time of the filing of the government's trial memorandum, provided

9    that defense counsel has complied with Defendant's obligations under Federal Rules of Criminal

10   Procedure 12.1, 12.2, and 16 and 26.2 and provided that defense counsel turn over all "reverse

11   Jencks" statements at that time.

12
              f.      The Government Objects To The Full Production Of Agents' Handwritten
13                    Notes At This Time

14         Although the government has no objection to the preservation of agents' handwritten notes,

15   it objects to requests for full production for immediate examination and inspection.  If certain

16   rough notes become relevant during any evidentiary proceeding, those notes will be made

17   available.

18         Prior production of these notes is not necessary because they are not "statements" within

19   the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a

20   witness' assertions *and* they have been approved or adopted by the witness.  United States v.

21   Spencer, 618 F.2d 605, 606-607 (9th Cir. 1980); see also United States v. Griffin,  659 F.2d 932,

22   936-938 (9th Cir. 1981).

23            g.      All Investigatory Notes and Arrest Reports

24         The government objects to any request for production of all arrest reports, investigator's

25   notes, memos from arresting officers, and prosecution reports pertaining to Defendant.  Such

26   reports, except to the extent that they include Brady material or the statements of Defendant, are

27

28                                    9                          07CR3212-LAB

1  protected from discovery by Rule 16(a)(2) as "reports . . . made by . . . Government agents in

2  connection with the investigation or prosecution of the case."

3      Although agents' reports may have already been produced to the defense, the government

4  is not required to produce such reports, except to the extent they contain <u>Brady</u> or other such

5  material.  Furthermore, the government is not required to disclose all evidence it has or to render

6  an accounting to Defendant of the investigative work it has performed.  <u>Moore v. Illinois</u>, 408 U.S.

7  786, 795 (1972); <u>see</u> <u>United States v. Gardner</u>, 611 F.2d 770, 774-775 (9th Cir. 1980).

8          h.    <u>Expert Witnesses</u>.

9      Pursuant to Fed. R. Crim. P. 16(a)(1)(G), at or about the time of filing its trial

10  memorandum, the government will provide the defense with notice of any expert witnesses the

11  testimony of whom the government intends to use under Rules 702, 703, or 705 of the Fed. R. of

12  Evidence in its case-in-chief.  Such notice will describe the witnesses' opinions, the bases and the

13  reasons therefor, and the witnesses' qualifications.  Reciprocally, the government requests that the

14  defense provide notice of its expert witnesses pursuant to Fed. R. Crim. P. 16(b)(1)(C).

15          i.    <u>Information Which May Result in Lower Sentence</u>.

16      Defendant has claimed or may claim that the government must disclose information about

17  any cooperation or any attempted cooperation with the government as well as any other

18  information affecting Defendant's sentencing guidelines because such information is discoverable

19  under <u>Brady v. Maryland</u>.  The government respectfully contends that it has no such disclosure

20  obligations under <u>Brady</u>.

21      The government is not obliged under <u>Brady</u> to furnish a defendant with information which

22  he already knows.  <u>United States v. Taylor</u>, 802 F.2d 1108, 1118 n.5 (9th Cir. 1986), <u>cert. denied</u>,

23  479 U.S. 1094 (1987); <u>United States v. Prior</u>, 546 F.2d 1254, 1259 (5th Cir. 1977).  <u>Brady</u> is a rule

24  of disclosure.  There can be no violation of <u>Brady</u> if the evidence is already known to Defendant.

25      Assuming that Defendant did not already possess the information about factors which

26  might affect their respective guideline range, the government would not be required to provide

27

28                                    10                          07CR3212-LAB

1   information bearing on Defendant's mitigation of punishment until after Defendant's conviction

2   or plea of guilty and prior to his sentencing date. "No [Brady] violation occurs if the evidence is

3   disclosed to the defendant at a time when the disclosure remains of value." United States v.

4   Juvenile Male, 864 F.2d 641 (9th Cir. 1988).

5

6   **B.      THE INDICTMENT SHOULD NOT BE DISMISSED FOR FAILURE TO
            ALLEGE "ESSENTIAL ELEMENTS"**

7           Defendant alleges that the Indictment must allege "voluntary entry," *mens rea* and

8   "inspection and admission" with specificity. An indictment charging that a deported alien is "found

9   in" the United States in violation of 8 U.S.C. § 1326 need not allege "voluntary entry" or mens rea

10  or the "inspection and admission" raised by Defendant. See United States v. Rivera-Sillas, 417

11  F.3d 1014, 1019-1021 (9th Cir. 2005). Indeed, all of Defendant's arguments are specifically

12  addressed in the Rivera-Sillas case or in United States v. Rodriguez-Rodriguez, 393 F.3d 849 (9th

13  Cir. 2005). Defendant's arguments are unsupported by law and should be denied.

14  **C.      DEFENDANT'S STATEMENTS SHOULD NOT BE SUPPRESSED**

15          Defendant moves for the suppression of both his field admission and his post-Miranda

16  statement to agents, asserting that the field statement resulted from a custodial interrogation and

17  that Defendant's Miranda waiver was not knowingly and voluntarily given. Defendant's

18  statements in the field to the apprehending agents prior to his arrest did not require a Miranda

19  warning, and Defendant fails to show that his post-arrest waiver was not knowingly, voluntarily,

20  and intelligently made. Defendant's motion to suppress statements should be denied without an

21  evidentiary hearing.

22          **1.      Statements in the Field**

23          Defendant was neither in custody, nor subjected to interrogation by BPAs when he was

24  apprehended in the field. A custodial interrogation is a prerequisite to the attachment of Miranda

25  rights. See Illinois v. Perkins, 496 U.S. 292, 297 (1990) ("It is the premise of Miranda that the

26  danger of coercion results from the interaction of custody and official interrogation."). To

27

28                                          11                          07CR3212-LAB

determine if a suspect is in custody, a court must assess the objective circumstances of the situation from the perspective of a reasonable person in the suspect's position.  See Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

United States v. Galindo-Gallegos, 244 F.3d 728 (9th Cir. 2001) is instructive here.  In Galindo-Gallegos, BPAs stopped several aliens running near, but north of, the border between the United States and Mexico, and questioned them regarding their citizenship.  In determining whether custodial interrogation took place, the Court first noted,

> The material factual circumstances here are that (1) the questioning took place out of doors; (2) the location was isolated, away from view by the general public, but there were 15 or 20 aliens and only two law enforcement officials; (3) no one was handcuffed, but everyone was required to sit on the ground; (4) the questions were a necessary predicate to letting anyone go free, but were also reasonably likely to elicit incriminating admissions by those for whom the facts were incriminating; and (5) the group of aliens had been caught running in an area very near the border, and Galindo-Gallegos had persisted in running away from the border patrol but was caught and returned to the group that had been seated on the ground.

Galindo-Gallegos, 244 F.3d at 734.  Based on these facts, the court upheld the admission of the statements, without Miranda warnings, because those facts showed a sufficiently public apprehension.

Here, Defendant was amongst a group eleven individuals walking on a trail that is only used by illegal aliens to further their entry into the United States.  Three of the individuals absconded, but Defendant remained.  During a field interview, Defendant then admitted that he was a citizen and national of Mexico without immigration documents entitling him to enter or remain in the United States.

The circumstances surrounding Defendant's field statement that could support a finding that he was "in custody" are even less substantial that those present in Galindo-Gallegos.  There is simply no evidence that the initial encounter between the agents and Defendant was a custodial interrogation.

Even if Defendant was in custody, the mere fact that a defendant is in custody is insufficient to make an incriminating statement inadmissible.  See Arizona v. Mauro, 481 U.S. 520,

1  528-530 (1987); Siripongs v. Calderon, 35 F.3d 1308, 1319 (9th Cir. 1994). "'Interrogation' as

2  conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond

3  that inherent in custody itself." Rhode Island v. Innis, 446 U.S. 291, 300 (1980). If a defendant

4  is in custody and there is no coercion or interrogation, then there is no constitutional violation in

5  admitting a statement made by that defendant regardless of the absence of Miranda warnings. See

6  Mauro, 481 U.S. at 528-530; Siripongs, 35 F.3d at 1319; Phillips v. Attorney General, 594 F.2d

7  1288, 1290 (9th Cir. 1979). Notably, statements made in response to routine investigative

8  questions and on-the-scene questions are admissible. See, e.g., United States v. Leasure, 122 F.3d

9  837, 840 (9th Cir. 1997) (Miranda warnings not required where Customs inspector at border

10  questioned defendant upon entry into the United States); Vickers v. Stewart,144 F.3d 613, 615 (9th

11  Cir. 1994) (no interrogation when prison guard pulled defendant from scene of the fire and asked

12  what happened). Here, an agent asked Defendant his citizenship status. This type of questioning

13  involves routine border-related questions and therefore does not amount to interrogation under

14  Miranda. Hence, the statements are admissible.

15      **2.    Post-Miranda Statements**

16      After his arrest, Defendant was taken to the Brown Field Station of the U.S. Border Patrol.

17  There, agents used Defendant's fingerprints to perform a computerized check of Defendant's

18  criminal and immigration history. Defendant was advised of his Miranda rights, which he

19  acknowledged and waived, and then gave a statement. Defendant moves to suppress statements

20  and requests that the Government prove that all statements were voluntarily made, and made after

21  a knowing and intelligent Miranda waiver. Defendant contends that 18 U.S.C. § 3501 mandates

22  an evidentiary hearing be held to determine whether Defendant's statements were voluntary.

23      a.    Knowing, Intelligent, and Voluntary Miranda Waiver

24      A statement made in response to custodial interrogation is admissible under Miranda v.

25  Arizona, 384 U.S. 437 (1966), and 18 U.S.C. § 3501 if a preponderance of the evidence indicates

26  that the statement was made after an advisement of Miranda rights, and was not elicited by

28                          13                  07CR3212-LAB

1  improper coercion.  See Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of

2  evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda

3  rights should not be found in the "absence of police overreaching").

4       A valid Miranda waiver depends on the totality of the circumstances, including  the

5  background, experience, and conduct of the defendant. North Carolina v. Butler, 441 U.S. 369,

6  374-75 (1979).   To be knowing and intelligent, "the waiver must have been made with a full

7  awareness of both the nature of the right being abandoned and the consequences of the decision

8  to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The Government bears the burden

9  of establishing the existence of a valid Miranda waiver. North Carolina v. Butler, 441 U.S. at 373.

10  In assessing the validity of a defendant's Miranda waiver, this Courts should analyze the totality

11  of the circumstances surrounding the interrogations.  See Moran v. Burbine, 475 U.S. at 421.

12  Factors commonly considered include: (1) the defendant's age (see United States v. Doe, 155 F.3d

13  1070, 1074-75 (9th Cir. 1998) (en banc) (valid waiver because the 17 year old defendant did not

14  have trouble understanding questions, gave coherent answers, and did not ask officers to notify

15  parents), (2) the defendant's familiarity with the criminal justice system (see United States v.

16  Williams, 291 F.3d 1180, 1190 (9th Cir. 2002) (waiver valid in part because defendant was

17  familiar with the criminal justice system from past encounters), (3) the explicitness of the Miranda

18  waiver (see United States v. Bernard S., 795 F.2d 749, 753 n.4 (9th Cir. 1986) (a written Miranda

19  waiver is "strong evidence that the waiver is valid"); United States v. Amano, 229 F.3d 801, 805

20  (9th Cir. 2000) (waiver valid where Miranda rights were read to defendant twice and defendant

21  signed a written waiver), and (4) the time lapse between the reading of the Miranda warnings and

22  the interrogation or confession.  See Guam v. Dela Pena, 72 F.3d 767, 769-70 (9th Cir. 1995)

23  (valid waiver despite 15-hour delay between Miranda warnings and interview). Furthermore, if

24  there are multiple interrogations, as occurred in this case, repeat Miranda warnings are generally

25  not required unless an "appreciable time" elapses between interrogations.  See United States v.

26  Nordling, 804 F.2d 1466, 1471 (9th Cir. 1986).

27

28                                      14                   07CR3212-LAB

Here, the agents scrupulously honored the letter and spirit of <u>Miranda</u> in carefully advising Defendant of his <u>Miranda</u> rights prior to any post-arrest custodial interrogation.  As evidenced by a signed I-214 form, Defendant was advised of his <u>Miranda</u> rights before the interrogation. Defendant agreed to waive his <u>Miranda</u> rights prior to questioning.  Based on the totality of the circumstances, Defendant's statements should not be suppressed because his <u>Miranda</u> waiver was knowing, intelligent, and voluntary.

b.      Defendant's Statements Were Voluntary

The inquiry into the voluntariness of statements is the same as the inquiry into the voluntariness of a waiver of <u>Miranda</u> rights. <u>See</u> <u>Derrick v. Peterson</u>, 924 F.2d 813, 820 (9th Cir. 1990).   Courts look to the totality of the circumstances to determine whether the statements were "the product of free and deliberate choice rather than coercion or improper inducement." <u>United States v. Doe</u>, 155 F.3d 1070, 1074(9th Cir. 1998)(en <u>banc</u>).

A confession is involuntary if "coerced either by physical intimidation or psychological pressure." <u>United States v. Crawford</u>, 372 F.3d 1048, 1060 (9th Cir. 2004) (quoting <u>United States v. Haswood</u>, 350 F.3d 1024, 1027 (9th Cir. 2003)).   In determining whether a defendant's confession was voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed.'" <u>Clark v. Murphy</u>, 331 F.3d 1062, 1072 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003) (<u>quoting</u> <u>Haynes v. Washington</u>, 373 U.S. 503, 513 (1963)).   Psychological coercion invokes no per se rule. <u>United States v. Miller</u>, 984 F.2d 1028, 1030 (9th Cir. 1993).   Therefore, the Court must "consider the totality of the circumstances involved and their effect upon the will of the defendant." <u>Id.</u> at 1031 (<u>citing</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973)).

In determining the issue of voluntariness, this Court should consider the five factors under 18 U.S.C. § 3501(b).  <u>United States v. Andaverde</u>, 64 F.3d 1305, 1311 (9th Cir. 1995).  These five factors include: (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he or she was charged or of which he was suspected at the

15                        07CR3212-LAB

1  time of making the confession, (3) whether or not such defendant was advised or knew that he or

2  she was not required to make any statement and that any such statement could be used against him,

3  (4) whether or not such defendant had been advised prior to questioning of his or her right to the

4  assistance of counsel; and (5)  whether or not such defendant was without the assistance of counsel

5  when questioned and when giving such confession.  18 U.S.C. § 3501(b).  All five statutory factors

6  under 18 U.S.C. § 3501(b) need not be met to find the statements were voluntarily made.  See

7  Andaverde, 64 F.3d at 1313.

8       As discussed above, Defendant was read his Miranda rights pre-interview.  After Defendant

9  acknowledged his Miranda rights, a dialogue ensued between the agent and Defendant, whereupon

10  Defendant decided to make a statement without having an attorney present.  Defendant clearly

11  understood his Miranda rights and agreed to waive those rights.  See United States v. Gamez, 301

12  F.3d 1138, 1144 (9th Cir. 2002).  Defendant's statements were not the product of physical

13  intimidation or psychological pressure of any kind by any government agent.  There is no evidence

14  that Defendant's will was overborne at the time of his statements.  Consequently, Defendant's

15  motion to suppress his statements as involuntarily given should be denied.

16       **3.        There Is No Need for an Evidentiary Hearing**

17       Under Ninth Circuit and Southern District precedent, as well as Southern District Local

18  Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to

19  suppress only when the defendant adduces specific facts sufficient to require the granting of the

20  defendant's motion.  See United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989); United

21  States v. Moran-Garcia, 783 F.Supp. 1266, 1274 (S.D. Cal. 1991); Crim. L.R. 47.1.  The local rule

22  further provides that "the Court need not grant an evidentiary hearing where either party fails to

23  properly support its motion for opposition."

24       No rights are infringed by the requirement of such a declaration.  Requiring a declaration

25  from a defendant in no way compromises Defendant's constitutional rights, as declarations in

26  support of a motion to suppress cannot be used by the United States at trial over a defendant's

27

28                                  16                        07CR3212-LAB

objection.  See Batiste, 868 F.2d at 1092 (proper to require declaration in support of Fourth Amendment motion to suppress); Moran-Garcia, 783 F. Supp. at 1271-74 (extending Batiste to Fifth Amendment motion to suppress).  Moreover, Defendant has as much information as the United States in regards to the statements he made.  See Batiste, 868 F.2d at 1092.  At least in the context of motions to suppress statements, which require police misconduct suffered by Defendant while in custody, Defendant certainly should be able to provide the facts supporting the claim of misconduct.

Finally, any objection that 18 U.S.C. § 3501 requires an evidentiary hearing in every case is of no merit.  Section 3501 requires only that the Court make a pretrial determination of voluntariness "out of the presence of the jury."  Nothing in section 3501 betrays any intent by Congress to alter the longstanding rule vesting the form of proof on matters for the court in the discretion of the court.  Batiste, 868 F.2d at 1092 ("Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.") (citation and quotation marks omitted).

The Ninth Circuit has expressly stated that a United States proffer based on the statement of facts attached to the complaint is alone adequate to defeat a motion to suppress where the defense fails to adduce specific and material facts.  See Batiste, 868 F.2d at 1092.  Moreover, the Ninth Circuit has held that a district court may properly deny a request for an evidentiary hearing on a motion to suppress evidence because the defendant did not properly submit a declaration pursuant to a local rule.  See United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991); United States v. Howell, 231 F.3d 616, 620 (9th Cir. 2000) ("An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."); see also United States v. Walczak, 783 F. 2d 852, 857 (9th Cir. 1986) (holding that evidentiary hearings on a motion to suppress are required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to whether contested issues of fact exist).  Even if Defendant provides factual allegations, the Court may still deny an evidentiary hearing if the grounds for

1  suppression consist solely of conclusory allegations of illegality.  See United States v. Wilson, 7

2  F.3d 828, 834-35 (9th Cir. 1993) (District Court Judge Gordon Thompson did not abuse his

3  discretion in denying a request for an evidentiary hearing where the appellant's declaration and

4  points and authorities submitted in support of motion to suppress indicated no contested issues of

5  fact).

6        As Defendant in this case has failed to provide declarations alleging specific and material

7  facts, the Court would be within its discretion to deny Defendant's motion based solely on the

8  statement of facts attached to the complaint in this case, without any further showing by the United

9  States.  Defendant's allegation of a Miranda violation is based upon boilerplate language that fails

10  to demonstrate there is a disputed factual issue requiring an evidentiary hearing.  See Howell, 231

11  F.3d at 623.

12        As such, this Court should deny Defendant's motion to suppress and his request for an

13  evidentiary hearing.

14
15  **D.    THE GRAND JURY INSTRUCTIONS WERE NOT FAULTY, AND THE INDICTMENT SHOULD NOT BE DISMISSED**

16        **1.    Introduction**

17        Defendant makes contentions relating to two separate instructions given to the grand jury

18  during its impanelment by Your Honor on January 10, 2007.  Defendant's Memorandum of Points

19  and Authorities at 15-30 (hereafter "Memorandum").[2]  Although recognizing that the Ninth Circuit

20  in United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir. 2005) (en banc) generally found the

21  two grand jury instructions constitutional, Defendant here contends that Your Honor went beyond

22

23        [2] Defendant supplies a partial transcript of the grand jury proceedings which records the
   instructions to the impaneled grand jurors after the voir dire had been conducted.  See Exhibit A
24  to Memorandum (hereafter "Exhibit A").  Defendant also supplies a partial transcript of the grand
   jury proceedings which records the voir dire of several potential witnesses.  See Exhibit B to
25  Memorandum (hereafter "Exhibit B").  To amplify the record herein, the United States is
   supplying a redacted supplemental transcript which records relevant portions of the voir dire
26  proceedings.  See Appendix to United States' Response and Opposition to Defendant's Motions
27  (hereafter "United States' Appendix").

28                                    18                        07CR3212-LAB

1    the text of the approved instructions, and by so doing rendered them improper to the point that the

2    Indictment should be dismissed.

3         In making his arguments concerning the two separate instructions, Defendant urges this

4    Court to dismiss the Indictment on two separate bases relating to grand jury procedures, both of

5    which were discussed in United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992).  Concerning the

6    first attacked instruction, Defendant urges this Court to dismiss the Indictment by exercising its

7    supervisory powers over grand jury procedures.  Memorandum at 28.  This is a practice the

8    Supreme Court discourages as Defendant acknowledges, citing United States v. Williams, 504 U.S.

9    36, 50 (1992) ("Given the grand jury's operational separateness from its constituting court, it

10   should come as no surprise that we have been reluctant to invoke the judicial supervisory power

11   as a basis for prescribing modes of grand jury procedure.").  Id.  Isgro reiterated:

12            [A] district court may draw on its supervisory powers to dismiss an
         indictment.  The supervisory powers doctrine "is premised on the inherent ability
13       of the federal courts to formulate procedural rules not specifically required by the
         Constitution or Congress to supervise the administration of justice."  Before it may
14       invoke this power, a court must first find that the defendant is actually prejudiced
         by the misconduct.  Absent such prejudice – that is, absent "'grave' doubt that the
15       decision to indict was free from the substantial influence of [the misconduct]" – a
         dismissal is not warranted.

16

17   974 F.2d at 1094 (citation omitted, emphasis added).  Concerning the second attacked instruction,

18   in an attempt to dodge the holding in Williams, Defendant appears to base his contentions on the

19   Constitution as a reason to dismiss the Indictment.  See Memorandum at 30 ("A grand jury so

20   badly misguided is no grand jury at all under the Fifth Amendment.").  Concerning that kind of a

21   contention, Isgro stated:

22       [A] court may dismiss an indictment if it perceives constitutional error that
         interferes with the grand jury's independence and the integrity of the grand jury
23       proceeding.  "Constitutional error is found where the 'structural protections of the
         grand jury have been so compromised as to render the proceedings fundamentally
24       unfair, allowing the presumption of prejudice' to the defendant."  Constitutional
         error may also be found "if [the] defendant can show a history of prosecutorial
25       misconduct that is so systematic and pervasive that it affects the fundamental
         fairness of the proceeding or if the independence of the grand jury is substantially
26       infringed."

27

28                                      19                        07CR3212-LAB

1    974 F.2d at 1094 (citation omitted).[3/]

2           The portions of the two relevant instructions approved in <u>Navarro-Vargas</u> were:

3           You cannot judge the wisdom of the criminal laws enacted by Congress,
       that is, whether or not there should or should not be a federal law designating
4           certain activity as criminal.   That is to be determined by Congress and not by you.

5    408 F.3d at 1187, 1202.

6           The United States Attorney and his Assistant United States Attorneys will
       provide you with important service in helping you to find your way when
7           confronted with complex legal problems.   It is entirely proper that you should
       receive this assistance.  If past experience is any indication of what to expect in the
8           future, then you can expect candor, honesty, and good faith in matters presented by
       the government attorneys.

9

10    408 F.3d at 1187, 1206.

11           Concerning the "wisdom of the criminal laws" instruction, the court stated it was

12    constitutional because, among other things, "[i]f a grand jury can sit in judgment of wisdom of the

13    policy behind a law, then the power to return a no bill in such cases is the clearest form of 'jury

14    nullification.'"[4/]  408 F.3d at 1203 (footnote omitted).  "Furthermore, the grand jury has few tools

15    for informing itself of the policy or legal justification for the law;  it receives no briefs or

16    arguments from the parties.   The grand jury has little but its own visceral reaction on which to

17    judge the 'wisdom of the law.'"  <u>Id.</u>

18           Concerning the "United States Attorney and his Assistant United States Attorneys"

19    instruction, the court stated:

20

21    _____

22           [3]  In <u>Isgro</u>, the defendants choose the abrogation of constitutional rights route when
       asserting that prosecutors have a duty to present exculpatory evidence to grand juries. They did
23    not prevail.  974 F.2d at 1096 ("we find that there was no abrogation of constitutional rights
       sufficient to support the dismissal of the indictment."  (relying on <u>Williams</u>)).
24

25           [4]  The Court acknowledged that as a matter of fact jury nullification does take place, and
       there is no way to control it.  "We recognize and do not discount that some grand jurors might <u>in</u>
26    <u>fact</u> vote to return a no bill because they regard the law as unwise at best or even unconstitutional.
       For all the reasons we have discussed, there is <u>no post hoc</u> remedy for that; the grand jury's
27    motives are not open to examination."  408 F.3d at 1204 (emphasis in original).

28                                                  20                            07CR3212-LAB

We also reject this final contention and hold that although this passage may include unnecessary language, it does not violate the Constitution.  The "candor, honesty, and good faith" language, when read in the context of the instructions as a whole, does not violate the constitutional relationship between the prosecutor and grand jury. . . .  The instructions balance the praise for the government's attorney by informing the grand jurors that some have criticized the grand jury as a "mere rubber stamp" to the prosecution and reminding them that the grand jury is "independent of the United States Attorney[.]"

408 F.3d at 1207. Id.  "The phrase is not vouching for the prosecutor, but is closer to advising the grand jury of the presumption of regularity and good faith that the branches of government ordinarily afford each other."  Id.

## 2.    The Expanded "Wisdom of the Criminal Laws" Instruction Was Proper

Concerning whether the new grand jurors should concern themselves with the wisdom of the criminal laws enacted by Congress, Your Honor's full instruction stated:

You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

But it's not for you to judge the wisdom of the criminal laws enacted by congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity is criminal is not up to you.  That's a judgment that congress makes.

And if you disagree with the judgment made by congress, then your option is not to say "Well I'm going to vote against indicting even though I think that the evidence is sufficient" or "I'm going to vote in favor of even though the evidence may be insufficient."  Instead, your obligation is to contact your congressman or advocate for a change in the laws, but not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting.

Exhibit A at 8-9.[5]

---

[5]  The United States' Appendix recounts the excusing of the three individuals.  This transcript involves the voir dire portion of the grand jury selection process, and has been redacted to include redaction of the individual names, so as to provide only the relevant three incidents wherein prospective grand jurors were excused.  Specifically, the pages of the supplemental transcript supplied are: United States' Appendix at 15, line 10; 17, line 18; 24, line 14; 28, line 2; 38, line 9; and 44, line 17.

21                                07CR3212-LAB

1    In line with <u>Navarro-Vargas</u>, you instructed the grand jurors that they were forbidden "from

2    judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should

3    be a federal law or should not be a federal law designating certain activity [as] criminal is not up

4    to you." Exhibit A at 8. Defendant claims, however, that the instructions "make it painfully clear

5    that grand jurors simply may not choose not to indict in the event of what appears to them to be

6    an unfair application of the law: should 'you disagree with that judgment made by Congress, then

7    your option is not to say 'well, I'm going to vote against indicting even though I think that the

8    evidence is sufficient. . . .'" Memorandum at 16. Defendant contends that this addition to the

9    approved instruction "flatly bars the grand jury from declining to indict because the grand jurors

10    disagree with a proposed prosecution." <u>Id.</u> Defendant further contends that the flat prohibition

11    was preemptively reinforced by Your Honor when you excused prospective grand jurors.

12    In concocting his theory of why Your Honor erred, Defendant posits that the expanded

13    instruction renders irrelevant the debate about what the word "should" means. Memorandum at

14    16. Defendant contends that "the instruction flatly bars the grand jury from declining to indict

15    because they disagree with a proposed prosecution." <u>Id.</u> This argument mixes-up two of the

16    holdings in <u>Navarro-Vargas</u> in the hope they will blend into one. They do not.

17    <u>Navarro-Vargas</u> does permit flatly barring the grand jury from disagreeing with the wisdom

18    of the criminal laws. The statement, "[y]ou <u>cannot</u> judge the wisdom of the criminal laws enacted

19    by Congress," (emphasis added) authorized by <u>Navarro-Vargas</u>, 408 F.3d at 1187, 1202, is not an

20    expression of discretion. Jury nullification is forbidden although acknowledged as a sub rosa fact

21    in grand jury proceedings. 408 F.3d at 1204. In this respect Your Honor was absolutely within

22    his rights, and within the law, when you excused the three prospective grand jurors because of their

23    expressed inability to apply the laws passed by Congress. Similarly, it was proper for you to

24    remind the impaneled grand jurors that they could not question the wisdom of the laws. As we will

25    establish, this reminder did not pressure the grand jurors to give up their discretion not to return

26    an indictment. Your Honor's words cannot be parsed to say that they flatly barred the grand jury

27

28                                            22                      07CR3212-LAB

from declining to indict because the grand jurors disagree with a proposed prosecution, because they do not say that. That aspect of a grand jury's discretionary power (i.e., disagreement with the prosecution) was dealt with in <u>Navarro-Vargas</u> in its discussion of another instruction wherein the term "should" was germane.[6/] 408 F.3d at 1204-06. This other instruction bestows discretion on the grand jury not to indict.[7/] In finding this instruction constitutional, the court stated in words that ring true here: "It is the grand jury's position in the constitutional scheme that gives it its independence, not any instructions that a court might offer." 408 F.3d at 1206. The other instruction was also given by Your Honor in your own fashion as follows:

> The function of the grand jury, in federal court at least, is to determine probable cause. That's the simple formulation that I mentioned to a number of you during the jury selection process. Probable cause is just an analysis of whether a crime was committed and there's a reasonable basis to believe that and whether a certain person is associated with the commission of that crime, committed it or helped commit it.

---

[6] That instruction is not at issue here. It read as follows:

> [Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

408 F.3d at 1187.

[7] The court upheld the instruction stating:

> This instruction does not violate the grand jury's independence. The language of the model charge does not state that the jury "must" or "shall" indict, but merely that it "should" indict if it finds probable cause. As a matter of pure semantics, it does not "eliminate discretion on the part of the grand jurors," leaving room for the grand jury to dismiss even if it finds probable cause.

408 F.3d at 1205 (confirming holding in <u>United States v. Marcucci</u>, 299 F.3d 1156, 1159 (9th Cir. 2002) (per curiam)). "In this respect, the grand jury has even greater powers of nonprosecution than the executive because there is, literally, no check on a grand jury's decision not to return an indictment. 408 F.3d at 1206.

1
2
3

      If the answer is yes, then as grand jurors your function is to find that the probable cause is there, that the case has been substantiated, and it should move forward.  If conscientiously, after listening to the evidence, you say "No, I can't form a reasonable belief has anything to do with it, then your obligation, of course, would be to decline to indict, to turn the case away and not have it go forward.

4

Exhibit A at 3-4.

5
6
7

      Probable cause means that you have an honestly held conscientious belief and that the belief is reasonable that a federal crime was committed and that the person to be indicted was somehow associated with the commission of that crime. Either they committed it themselves or they helped someone commit it or they were part of a conspiracy, an illegal agreement, to commit that crime.

8
9

      To put it another way, you should vote to indict when the evidence presented to you is sufficiently strong to warrant a reasonable person to believe that the accused is probably guilty of the offense which is proposed.

10

Exhibit A at 23.

11      While the new grand jurors were told by Your Honor that they could not question the

12  wisdom of the criminal laws per Navarro-Vargas, they were also told by Your Honor they had the

13  discretion not to return an indictment per Navarro-Vargas.  Further, if a potential grand juror could

14  not be dissuaded from questioning the wisdom of the criminal laws, that grand juror should be

15  dismissed as a potential jury nullification advocate.  See Merced v. McGrath, 426 F.3d 1076, 1079-

16  80 (9th Cir. 2005).  Thus, there was no error requiring dismissal of this Indictment or any other

17  indictment by this Court exercising its supervisory powers.

18      Further, a reading of the dialogues between Your Honor and the three excused jurors found

19  in the supplemental transcript excerpts (see United States' Appendix) reflects a measured,

20  thoughtful, almost mutual decision, that those three individuals should not serve on the grand jury

21  because of their views.  Your Honor's reference back to those three colloquies cannot be construed

22  as pressuring the impaneled grand jurors, but merely bespeaks a reminder to the grand jury of their

23  duties.

24      Finally, even if there was an error, Defendant has not demonstrated he was actually

25  prejudiced thereby, a burden he has to bear. "Absent such prejudice – that is, absent 'grave' doubt

26
27
28

1  that the decision to indict was free from the substantial influence of [the misconduct]' – a dismissal

2  is not warranted." <u>Isgro</u>, 974 F.2d at 1094.

3     **3.**     **The Addition to the "United States Attorney and his Assistant United States**

4             **Attorneys" Instruction Did Not Violate the Constitution**

5      Concerning the new grand jurors' relationship to the United States Attorney and the

6  Assistant U.S. Attorneys, Your Honor variously stated:

7      [T]here's a close association between the grand jury and the U.S. Attorney's Office.

8         . . . . You'll work closely with the U.S. Attorney's Office in your
       investigation of cases.

9

10  Exhibit A at 11.

11      [I]n my experience here in the over 20 years in this court, that kind of tension does
       not exist on a regular basis, that I can recall, between the U.S. Attorney and the

12      grand juries. They generally work together.

13  Exhibit A at 12.

14         Now, again, this emphasizes the difference between the function of the
       grand jury and the trial jury. You're all about probable cause. If you think that

15      there's evidence out there that might cause you to say "well, I don't think probable
       cause exists," then it's incumbent upon you to hear that evidence as well. As I told

16      you, in most instances, the U.S. Attorneys are duty-bound to present evidence that
       cuts against what they may be asking you to do if they're aware of that evidence.

17

18  Exhibit A at 20.[8]

19      As a practical matter, you will work closely with government lawyers. The U.S.
       Attorney and the Assistant U.S. Attorneys will provide you with important services

20      and help you find your way when you're confronted with complex legal matters.
       It's entirely proper that you should receive the assistance from the government

21      lawyers.

22

23  ───────────────

24      [8] Just prior to this instruction, Your Honor had informed the grand jurors that:

25      [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a
       full-blown trial, you're likely in most cases not to hear the other side of the

26      story, if there is another side to the story.

27      Exhibit A at 19.

28                        25                     07CR3212-LAB

1
2
3

But at the end of the day, the decision about whether a case goes forward and an indictment should be returned is yours and yours alone.  If past experience is any indication of what to expect in the future, then you can expect that the U.S. Attorneys that will appear in front of you will be candid, they'll be honest, that they'll act in good faith in all matters presented to you.

4
Exhibit A at 26-27.

5
Commenting on the phrase, "the U.S. Attorneys are duty-bound to present evidence that

6
cuts against what they may be asking you to do if they're aware of that evidence," Defendant

7
proposes that by making that statement, "Judge Burns also assured the grand jurors that

8
prosecutors would present to them evidence that tended to undercut probable cause."

9
Memorandum at 19.  Defendant then ties this statement to the later instruction which "advis[ed]

10
the grand jurors that they 'can expect that the U.S. Attorneys that will appear in front of [them] will

11
be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you.'"  Id.

12
From this lash-up Defendant contends:

13
14
15

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

16
(1) I have to consider evidence that undercuts probable cause.

17
(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

18
19
(3) Because no such evidence was presented to me, I may conclude that there is none.

20
21

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

22
23
24
25

The instructions therefore discourage investigation – if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

26
27
28

1  Memorandum at 30.[9]

2  Frankly, Your Honor's statement that "the U.S. Attorneys are duty-bound to present

3  evidence that cuts against what they may be asking you to do if they're aware of that evidence,"

4  is directly contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury

5  has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the

6  prosecutor can be said to have a binding obligation to present it."[10] (emphasis added)).  See also

7  United States v. Haynes, 216 F.3d 789, 798 (9th Cir.  2000) ("Finally, their challenge to the

8  government's failure to introduce evidence impugning Fairbanks's credibility lacks merit because

9  prosecutors have no obligation to disclose 'substantial exculpatory evidence' to a grand jury."

10  (citing Williams) (emphasis added)).

11  However, the analysis does not stop there.  Prior to assuming his judicial duties, Your

12  Honor was a member of the United States Attorney's Office, and made appearances in front of the

13

14  [9]  The term "presumption" is too strong a word in this setting.  The term "inference" is

15  more appropriate.  See McClean v. Moran, 963 F.2d 1306 (9th Cir. 1992) which states there are
(1) permissive inferences; (2) mandatory rebuttable presumptions; and (3) mandatory conclusive

16  presumptions, and explains the difference between the three.  963 F.2d at 1308-09 (discussing

17  Francis v. Franklin, 471 U.S. 314 (1985); Sandstrom v. Montana, 442 U.S. 510 (1979); and Ulster
County Court v. Allen, 442 U.S. 140, 157 & n. 16 (1979)).  See also United States v. Warren, 25

18  F.3d 890, 897 (9th Cir. 1994).

19  [10]  Note that in Williams the Court established:

20  Respondent does not contend that the Fifth Amendment itself obliges the
prosecutor to disclose substantial exculpatory evidence in his possession to the

21  grand jury.  Instead, building on our statement that the federal courts "may, within
limits, formulate procedural rules not specifically required by the Constitution or

22  the Congress," he argues that imposition of the Tenth Circuit's disclosure rule is
supported by the courts' "supervisory power."

23

24  504 U.S. at 45 (citation omitted).  The Court concluded, "we conclude that courts have no

25  authority to prescribe such a duty [to present exculpatory evidence] pursuant to their inherent
supervisory authority over their own proceedings."  504 U.S. at 55.  See also United States v.

26  Haynes, 216 F.3d 789, 797-98 (9th Cir.  2000).  However, the Ninth Circuit in Isgro used
Williams' holding that the supervisory powers would not be invoked to ward off an attack on

27  grand jury procedures couched in constitutional terms.  974 F.2d at 1096.

28

federal grand jury.[11/] As such you were undoubtedly aware of the provisions in the United States Attorneys' Manual ("USAM").[12/] Specifically, it appears you were aware of USAM Section 9-11.233, which states:

> In <u>United States v. Williams</u>, 112 S.Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the <u>policy</u> of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of <u>substantial evidence that directly negates the guilt</u> of a subject of the investigation, the prosecutor <u>must present or otherwise disclose</u> such evidence to the grand jury before seeking an indictment against such a person. While a failure to follow the Department's policy should <u>not result in dismissal of an indictment</u>, appellate courts <u>may refer violations of the policy to the Office of Professional Responsibility</u> for review.

(Emphasis added.)[13/] This policy was reconfirmed in USAM 9-5.001, Policy Regarding Disclosure of Exculpatory and Impeachment Information, Paragraph "A," "this policy does not alter or supersede the policy that requires prosecutors to disclose '<u>substantial evidence</u> that directly negates the guilt of a subject of the investigation' to the grand jury before seeking an indictment, <u>see</u> USAM § 9-11.233 ." (Emphasis added.)[14/]

---

[11] You recalled those days when instructing the new grand jurors. Exhibit A at 12, 14-16, 17-18.

[12] The USAM is available on the World Wide Web at www.usdoj.gov/usao/eousa/foia_reading_room/ usam/index.html.

[13] <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/ title9/11mcrm.htm. Even if Your Honor did not know of this provision in the USAM while you were a member of the United States Attorney's Office, because of the accessability of the USAM on the Internet, as the District Judge overseeing the grand jury you certainly could determine the required duties of the United States Attorneys appearing before the grand jury from that source.

[14] <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm. Similarly, this new section does not bestow any procedural or substantive rights on defendants.

> Under this policy, the government's disclosure will exceed its constitutional obligations. This expanded disclosure policy, however, does not create a general right of discovery in criminal cases. Nor does it provide defendants with any additional rights or remedies.

(continued...)

The facts that Your Honor's statement contradicts <u>Williams</u>, but is in line with self-imposed guidelines for United States Attorneys, does not create the constitutional crisis proposed by Defendant. No improper presumption/inference was created when Your Honor reiterated what you knew to be a self-imposed duty to the new grand jurors. Simply stated, in the vast majority of the cases the reason the prosecutor does not present "substantial" exculpatory evidence, is because no "substantial" exculpatory evidence exists.[15/]  If it does exist, as mandated by the USAM, the evidence should be presented to the grand jury by the Assistant U.S. Attorney upon pain of possibly having his or her career destroyed by an Office of Professional Responsibility investigation.  Even if there is some nefarious slant to the grand jury proceedings when the prosecutor does not present any "substantial" exculpatory evidence, because there is none, the negative inference created thereby in the minds of the grand jurors is legitimate.  In cases such as Defendant's, the Government has no "substantial" exculpatory evidence generated from its investigation or from submissions tendered by the defendant.[16/]  There is nothing wrong  in this scenario with a grand juror inferring from this state-of-affairs that there is no "substantial"

_____

(...continued)
USAM 9-5.001, ¶"E".  <u>See</u> www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/ 5mcrm. htm.

[15]  Recall Your Honor also told the grand jurors that:

> [T]hese proceedings tend to be one-sided necessarily. . . . Because it's not a full-blown trial, you're likely in most cases not to hear the other side of the story, if there is another side to the story.

Exhibit A at 19.

[16]  Realistically, given "that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge [i.e. only finding probable cause]," <u>Williams</u>, 504 U.S. at 51 (citing <u>United States v. Calandra</u>, 414 U.S. 338, 343-44 (1974)), no competent defense attorney is going to preview the defendant's defense story prior to trial assuming one will be presented to a fact-finder.  Therefore, defense submissions to the grand jury will be few and far between.

1    exculpatory evidence, or even if some exculpatory evidence were presented, the evidence

2    presented represents the universe of all available exculpatory evidence.

3        Further, just as the instruction language regarding the United States Attorney attacked in

4    Navarro-Vargas was found to be "unnecessary language [which] does not violate the Constitution,"

5    408 F.3d at 1207, so too the "duty-bound" statement was unnecessary when charging the grand

6    jury concerning its relationship with the United States Attorney and her Assistant U.S. Attorneys,

7    and does not violate the Constitution.  In United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992), the

8    Ninth Circuit while reviewing Williams established that there is nothing in the Constitution which

9    requires a prosecutor to give the person under investigation the right to present anything  to the

10   grand jury (including his or her testimony or other exculpatory evidence), and the absence of that

11   information does not require dismissal of the indictment.  974 F.2d at 1096 ("Williams clearly

12   rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations.").

13   That the USAM imposes a duty on United States Attorneys to present "substantial" exculpatory

14   evidence to the grand jury is irrelevant since by its own terms the USAM excludes defendants from

15   reaping any benefits from the self-imposed policy.[17]  Therefore, while the "duty-bound" statement

16   was an interesting tidbit of information, it was unnecessary in terms of advising the grand jurors

17   of their rights and responsibilities, and does not cast an unconstitutional pall upon the instructions

18   which requires dismissal of the indictment in this case or any case.  The grand jurors were

19   repeatedly instructed by Your Honor that, in essence, the United Sates Attorneys are "good guys,"

20   which was authorized by Navarro-Vargas.  408 F.3d at 1206-07 ("laudatory comments . . . not

21   vouching for the prosecutor").  But you also repeatedly "remind[ed] the grand jury that it stands

22   between the government and the accused and is independent," which was also required by

23   Navarro-Vargas.  408 F.3d at 1207.  In this context the unnecessary "duty-bound" statement does

24

25   ─────────────────────

26       [17] The apparent irony is that although an Assistant U.S. Attorney will not lose a case for
     failure to present exculpatory information to a grand jury per Williams, he or she could lose his
27   or her job with the United States Attorney's Office for such a failure per the USAM.

28                                    30                        07CR3212-LAB

not mean the instructions were constitutionally defective requiring dismissal of this indictment or any indictment.

The "duty bound" statement constitutional contentions raised by Defendant do not indicate that the "'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice' to the defendant," and "[the] defendant can[not] show a history of prosecutorial misconduct that is so systematic and pervasive that it affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." Isgro, 974 F.2d at 1094 (citation omitted). Therefore, this Indictment, or any other indictment, need not be dismissed.

**E.    NO OPPOSITION TO LEAVE TO FILE FURTHER MOTIONS**

The United States does not object to the granting of leave to allow Defendant to file further motions, as long as the order applies equally to both parties and additional motions are based on newly discovered evidence or discovery provided by the United States subsequent to the instant motion at issue.

**IV**

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that its motions be granted.

DATED: January 4, 2008.

Respectfully submitted,

KAREN P. HEWITT
United States Attorney


s/ William A. Hall, Jr.
WILLIAM A. HALL, JR.
Assistant United States Attorney

31                                07CR3212-LAB